**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.A., natural parent, o/b/o his minor child, C.A., | |
| Plaintiff, | Civ. No. 07-1179 (DRD) |
| v. | |
| VILLAGE OF RIDGEWOOD BOARD OF EDUCATION and DR. JOHN PORTER, individually and in his official capacity as Superintendent of the Village of Ridgewood Board of Education, | **O P I N I O N** |
| Defendants. | |

*Appearances by:*

Ty Hyderally, Esq.
Rachel Adler Jaffee, Esq.
LAW OFFICES OF TY HYDERALLY, PC
96 Park Street
Montclair, New Jersey 07042

    *Attorneys for the Plaintiff*

Philip E. Stern, Esq.
Erin E. McLaughlin, Esq.
ADAMS STERN GUTIERREZ & LATTIBOUDERE, LLC
744 Broad Street, Suite 1600
Newark, New Jersey 07102

    *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

On March 12, 2007, Plaintiff, J.A., natural parent on behalf of his minor child, C.A., filed this action against the Village of Ridgewood Board of Education (the "Board of Education"), the Village of Ridgewood, and Dr. John Porter, individually and in his capacity as Superintendent of the Board of Education.  In the complaint, J.A. alleged violations of C.A.'s civil rights under 42 U.S.C. §§ 1983, 1985, and 1986; violation of C.A.'s rights under the New Jersey State Constitution; and violation of C.A.'s rights under the New Jersey Law Against Discrimination ("NJLAD").  The Board of Education and Dr. Porter filed a third-party complaint against Biddy Basketball, Inc. ("Biddy") for indemnification and contribution, but have now dismissed all claims in the third-party complaint.  All claims by and against the Village of Ridgewood have been dismissed.  J.A. has dismissed all claims against the Board of Education and Dr. Porter except for the claims under the NJLAD.  This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1367.

J.A. moves for summary judgment on the claims under the NJLAD against the Board of Education and Dr. Porter (the "Defendants").  The Defendants also move for summary judgment dismissing the claims under the NJLAD.  For the reasons set forth below, J.A.'s motion will be denied and the Defendants' motion will be granted.

## I.  BACKGROUND

**A.     The Parties**

J.A. and C.A. are residents of the Village of Ridgewood, New Jersey.  C.A. is currently in the tenth grade at Ridgewood High School, where she participates on the junior varsity girls' basketball team.  The events that gave rise to this litigation occurred in 2004 and 2005 when

C.A. wanted to play on the boys' team in the Biddy recreational league.  At the time, Dr. Porter was the superintendent of the Board of Education.

Biddy was founded in 1975 to provide a scaled-down basketball game for Ridgewood's youth in the 3rd through the 8th grades.  Biddy leases/rents gymnasiums owned by the Board of Education, where it holds its practices and games.  Biddy pays rent and/or a fee to the Board of Education to use its gymnasiums.  Biddy's Board of Trustees is made up of residents of Ridgewood and it holds meetings in property owned by the Village of Ridgewood.

The Board of Education maintains a policy entitled "Use of School Facilities."  That policy prohibits the use of school facilities for "any purpose which is prohibited by law." (Certification of Philip E. Stern, March 11, 2009 (the "Stern Cert."), Ex. O.)  Biddy completed permits for the use of school facilities during the 2004 – 2005 school year.  Those permits bound Biddy to the regulations for the use of school facilities and contained a reminder that "[t]he Board of Education supports equal educational opportunity and is an affirmative action employer."  (Id. Ex. P.)

**B.     C.A.'s Attempt to Register for the Boys' Basketball Team**

On July 6, 2004, J.A. registered his then twelve year old daughter, C.A., for the 5th/6th grade Biddy recreational league via the required on-line registration.  Because there was no mechanism at the time for a girl to register to play on a boy's team, J.A. made a special notation on the form where it asked, "Is there a particular team or friend(s) you would like to play with?" J.A. wrote, "I want her to play with the boys."  C.A., who was in the 6th grade at the time, wanted to play on the 5th/6th grade boys' team because the boys played with a basketball hoop that was ten feet high, whereas the 5th/6th grade girls' team played with a hoop that was eight

and a half feet high.  C.A. had been playing on a ten feet high hoop since the 5th grade, and the

other teams on which C.A. played during her 6th grade year also used ten feet high hoops.

Switching back and forth between hoops of different heights was disruptive to C.A.'s

performance.

On October 30, 2004, C.A. and J.A. went to the evaluations for the Biddy 5th/6th grade

boys' team at the Somerville School in Ridgewood, where C.A. was evaluated.  There were no

try-outs for the Biddy Recreational League.  Rather, all children were "evaluated" and

guaranteed a spot on the team.  The parties do not dispute that C.A. was qualified to play on the

boys' team.  She made all of the baskets requested of her during her evaluation, but J.A. later

learned that C.A. would not be permitted to play on the boys' team.  No one ever told C.A.

directly why she was not being permitted to play on the boys' 5th/6th grade team.

In early November, C.A.'s mother sought the assistance of the Board of Education and,

specifically, made a phone call to Dr. Porter.  Dr. Porter told C.A.'s mother that C.A.'s desire to

play on the boys' team "sounded reasonable" and agreed to look into the matter.[1]  Dr. Porter

testified that after he spoke with C.A.'s mother, he asked Board of Education employee Garland

Allen (Director of Wellness for the school district) to look into the issue.  Shortly after Dr. Porter

received the call from C.A.'s mother, he participated in a meeting with Tim Cronin, the Director

of Parks and Recreation for the Village of Ridgewood; Nancy Bigos, who worked with Mr.

Cronin; Mr. Allen; and Jim Cosgrove from Biddy.  The meeting was intended to "bring all the

facts together."  At the meeting, Mr. Allen shared the results of his research, including some

research that claimed that both boys and girls should be playing on eight and a half foot hoops

---

[1] Dr. Porter testified at his deposition that he did not believe that allowing C.A. to play on the

until the age of twelve and/or the end of the 6th grade.  At his deposition, Dr. Porter summarized the topics discussed during that meeting:

> Well, the requests by the parents of C.A. to play with the boys.  The position of Biddy Basketball, why that wasn't possible, the research that Gardland [Allen] had found out about the Biddy's national position on the height of the baskets and boys and girls playing together, those were the topics that were discussed as well as looking for an external guideline to where we stand on this from another entity.  It was at that meeting that we decided that we would reach out to the state agencies that deal with this to find out where they stood on that.

(Porter Dep. 23:15 – 25, Dec. 30, 2008.)

At that meeting, Dr. Porter and the other members of the Board of Education who were present learned that Ridgewood Biddy was no longer part of the national Biddy organization.  In the national organization, boys and girls played together with and eight and a half foot hoop up until age twelve or the end of the 6th grade.  Dr. Porter believed that this information regarding the national Biddy standard would help resolve the issue with C.A.  He thought he could get Ridgewood Biddy to move toward the national standard "and at least have C.A. and other girls play with boys."  (Id. 29:23 – 24.)  He testified that he thought "that was how we were going to get everybody – come up with a compromise."  (Id. 30:2 – 3.)  He also testified that it was his intent to use whatever information he gathered as leverage with Biddy to encourage Biddy to allow C.A. to play with the boys.  He thought that if Ridgewood Biddy adopted the national Biddy standards it would solve the problem.  He shared the information about the national Biddy standards with J.A., but J.A. did not agree that it would solve the problem because the height of the basket was the issue for C.A.

---

boys' team would degrade the recreational basketball program, as Biddy claimed it would.

J.A. registered C.A. with the Biddy recreational league again on November 8, 2004.  On November 12, C.A.'s mother sent an email to David Grubb, who was a coach for a Biddy basketball team.  In that email, she stated that she had spoken with Dr. Porter that morning regarding a meeting the previous evening at which "Biddy was told that the school board will not violate Title 9 and would have to ban the program from the schools if they did not permit C.A. to play."  (Stern Cert. Ex. U.)  She also said that Dr. Porter reported that Biddy claimed that C.A. was not registered to play in the Biddy recreational league and that they did not have any formal request that she be allowed to play with the boys.  (Id.)  Dr. Porter told C.A.'s mother that Mr. Cronin requested that she or J.A. bring the registration to him that day and provide a letter with the request that C.A. play on the boys' team.  (Id.)  On the same day, J.A. made a formal written request to Biddy President, James Cosgrove, to have C.A. play on the boys' team.

The basketball season began on November 13, 2004.  On November 14, J.A. filed a complaint against Biddy, on behalf of C.A., with the New Jersey Division of Civil Rights ("DCR").  (Id. Ex. G.)  The complaint filed with the New Jersey DCR charged Ridgewood Biddy Basketball with "unlawful public accommodation discrimination" and stated that C.A. was discriminated against in that she had "been deprived of a competitive advantage because of her sex."  (Id.)

On November 18, 2004, Mr. Allen sent a memo to Dr. Porter, Nancy Bigos, Joe Cappello, Tim Cronin and Jim Cosgrove regarding the issue with Biddy.  The memo stated:

On Wednesday, November 17, 2004, I contacted the offices for Civil Rights in Paterson and Newark, New Jersey, as well as the district offices in Boston and New York.  Paterson and Newark did not return calls.  I did speak to compliance officers in the Boston and New York offices.  Although they prefer not to comment on specific situations until there is a filing, there was a clear and consistent message from both offices.  Neither the height of the basket nor the size of the ball would be considered discriminatory.

Their judgments are based on an overall equity throughout the entire program, not isolated practices or procedures.  In addition, basketball is considered a contact sport, which means that separate teams are legal.  In fact, even if there was only a boy's basketball team in existence, Biddy could legally deny girls access to that team because basketball is a contact sport.  (See information attached)

In my conversations with the New York and Boston Offices for Civil Rights there was agreement that reasonable adults should be able to work this out based on what would be in the best interest of the children in the program?  [sic]

(Id. Ex. Q.)  Mr. Allen attached to the memo what appears to be information from an office of civil rights regarding how Title IX (the Federal law that prohibits discrimination on the basis of sex in any education program or activity that receives Federal financial assistance) applies to athletic programs.  See 20 U.S.C. § 1681.  He also attached to the memo a portion of the Code of Federal Regulations (34 C.F.R. 106.41, sub-parts (a) and (b), and all of sub-part (c) except the last paragraph) entitled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance.

During the Thanksgiving break of 2004, James Sincaglia, Chief of the Bureau of Enforcement at the New Jersey DCR, phoned Dr. Porter and recommended that the Board of Education immediately terminate its relationship with Biddy and stop them from using the Board of Education's facilities unless the Board of Education forced Biddy to allow C.A. to play on the boys' team.  Dr. Porter testified that he was stunned that someone would call him from the New

7

Jersey DCR, "not even ask what the situation was" and direct him to do something, especially when "we spent weeks trying to get someone to call us back from his division." (Porter Dep. 45:10 – 46:17, Dec. 30, 2008.) Dr. Porter further testified that he told Mr. Sincaglia that the divisions of civil rights from two other states had advised them that it was a "Title IX issue," meaning that separate but equal teams were acceptable. (Id. 46:16 – 47:3; 34:20 – 35:1.) Dr. Porter testified that Mr. Sincaglia then told him that it was not a Title IX issue but, rather, "a Title X issue with equal access." (Id. 46:24 – 47:1.) On or before December 3, 2004, Mr. Sincaglia also told Mr. Allen that Biddy was violating state law by not allowing C.A. to play with the boys and that the Board of Education should force Biddy to permit her to play.

On December 7, 2004, Mr. Allen sent an email to Mr. Sincaglia asking for Mr. Sincaglia's professional assessment of the matter in writing, nothing that "we as a School District have a no tolerance policy towards discrimination and wish to insure that we are not supporting this practice by leasing our facilities to the Ridgewood Biddy Basketball Association." (Certification of Ty Hyderally, March 10, 2009 ("Hyderally Cert."), Ex. 13.) On December 9, 2004, Mr. Sincaglia responded to Mr. Allen's email. (Id. Ex. 14.) Mr. Sincaglia advised that he could not comment specifically on an on-going investigation but explained:

> The New Jersey Law Against Discrimination prohibits discrimination based upon gender in places of public accommodation. Since both the Ridgewood Public School System and Ridgewood Biddy Basketball are public accommodations, they would not be permitted to deny any individual any facility, advantage or privilege of their places of public accommodation based upon the gender of that individual. I trust that this is responsive to your inquiry. Further, it is my understanding that the parties are attempting to resolve the issue in some amicable fashion. Please advise me of the outcome of this, since the Division is continuing to investigate the matter and will be prepared to issue a determination in the very near future.

(<u>Id.</u>)  In a report from John Porter to the Board of Education dated December 10, 2004, Dr.
Porter included the December 9 email from Mr. Sincaglia and stated that "Garland Allen is
sending this information to the Recreation Department and we're asking for a response from
them (and Biddy) on how they will implement this decision."  (<u>Id.</u> Ex. 16.)

Tim Cronin, the director of parks and recreation for the Village of Ridgewood, testified
that he had a telephone conversation with a representative from Biddy where he stressed the
severity of the situation with C.A. and informed Biddy that discriminatory actions could threaten
the basketball program.  (Cronin Dep. 19:23 – 21:9, Jan. 27, 2009.)  He told the representative
that Biddy could lose the use of the gym space.  (<u>Id.</u> 24:5 – 18.)  Mr. Cronin also testified that he
attended a meeting of Biddy's Board of Trustees, where he "reminded them of Dr. Porter's
concerns" regarding C.A.'s allegations of discrimination, that the State was involved (with the
investigation), and that Biddy could lose its gym space.  (<u>Id.</u> 26:4 – 23.)

On December 17, 2004, Joseph Cappello, the former business administrator for the Board
of Education, sent a letter to Mr. Cronin regarding the Biddy issue and copied the letter to Mr.
Cosgrove, the president of Biddy.  Dr. Cappello's letter stated that the Board of Education was
"concerned that Biddy Basketball's response to [C.A.'s] request [to play on the boys' team] may
violate state and federal anti-discrimination laws."  (Stern Cert. Ex. R.)  The letter also reiterated
that when the Board of Education grants a request for use of its facilities, "it does so with the
explicit expectation that the group will comply with all federal and state anti-discrimination
laws."  (<u>Id.</u>)  Dr. Cappello continued,

> Therefore, we authorize you to inform Biddy Basketball of its
> obligation under the law, and to immediately do all things necessary
> to demonstrate its compliance with all relevant anti-discrimination
> laws.  We also authorize you to inform Biddy Basketball its failure to

> comply with anti-discrimination laws may result in the immediate
> revocation of its permission to use Board [of Education] and Village
> [of Ridgewood] facilities.

(Id.)

On December 22, 2004, counsel for Biddy filed with the New Jersey DCR (1) an answer to the complaint that J.A. had filed with the New Jersey DCR, (2) a position statement, and (3) a response to the document and information request with the DCR.  The position statement filed by Biddy provided a detailed explanation of the organization's inner workings and the structure of the programs and services it provides to the children of Ridgewood.  The statement also outlined the origination of the "private organization" and discussed its rules and regulations.  In the statement Biddy also denied that any discriminatory actions had been taken toward C.A.  Biddy stated that allowing C.A. to play on the boys' 5th/6th grade team would "seriously degrade the Program, especially at the girls 5th/6th grade level."  The position statement further stated:

> The [Biddy] Board recognized that one of the main goals of the
> Program in regard to its recreational teams is to provide an
> opportunity for youngsters of all skill level [sic] to learn and play
> the game of basketball in an atmosphere that will encourage development
> and growth through sportsmanship, teamwork and resourcefulness.
> The [Biddy] Board made a determination that permitting [C.A.] to
> play on a boys 5th/6th grade team would undermine the Program and
> would, over time if not immediately, have a negative effect on the
> quality of opportunity of play within the various leagues and
> specifically within the girls 5th/6th grade league.

(Stern Cert. Ex. I at 8-9.)  According to the position statement, the Biddy Board "collectively made an informed determination that permitting [C.A.] to play on a boys 5th/6th grade team posed a serious safety hazard" because those teams played a very "aggressive" game of basketball while the girls on the 5th/6th grade teams played "less aggressively and with more

10

'finesse.'"

On January 13, 2005, the DCR issued a finding of probable cause that Biddy discriminated against C.A. in violation of the NJLAD.  On January 14, 2005, J.A. signed an amended complaint with the DCR to include the Board of Education as a respondent.  (Stern Cert. Ex. K.)

Dr. Porter testified that sometime near the end of January, 2005, he learned from Mr. Garland and the attorney for the Board of Education that Biddy and C.A.'s parents had reached a settlement.[2]  (Porter Dep. 69:14 – 18; 70:7 – 10, Dec. 30, 2008.)

In an email dated January 31, 2005, J.A. complained to the Village Manager, Mr. J. TenHoeve, that Mr. Cronin had called the police, at the behest of Biddy, in an attempt to deny J.A. and C.A. entrance to a Biddy game at Somerville School.  (Stern Cert. Ex. T.)

On February 1, 2005, Dr. Cappello sent a second letter to Mr. Cronin, copied to Mr. Cosgrove, where he stated that the New Jersey DCR had issued a "probable cause" determination, which credited C.A.'s allegations that Biddy was violating the NJLAD by refusing to allow her to play on the boys' team.  (Id. Ex. S.)  The letter stated that the Board of Education was required to uphold the NJLAD at all times and that this responsibility included ensuring that groups who use the Board of Education's facilities also uphold the NJLAD.  (Id.) Dr. Cappello asked that Mr. Cronin serve the letter "upon all people with relevant knowledge associated with Biddy Basketball, and make it unmistakably clear to them that Biddy Basketball

_____

[2] At oral argument on this motion, counsel for the Defendants represented to the court that Dr. Porter sent an update to the Board of Education, dated January 21, 2005, to inform its members that Biddy and C.A.'s parents had reached an agreement to let C.A. play, but that they were still working out the details of the settlement.  That document was not submitted to the court in conjunction with this motion.

must immediately cease and desist from even any appearance of discriminatory conduct" and that C.A. must be allowed to play on the boys' team immediately.  (Id.)

The season ended with a final game on March 16, 2005.  C.A. was not permitted to play in any games in the Biddy recreational league during the 2004 – 2005 season.

On May 11, 2005, the New Jersey DCR issued an amended finding of probable cause that the Board of Education aided and abetted Biddy in the discrimination committed against C.A. (Hyderally Cert. Ex. 19.)

On September 2, 2005, J.A. and Biddy entered into a Consent Order and Decree, whereby Biddy agreed to allow C.A. and any other girl wishing to play on the boys' team to do so.  In exchange, the family released Biddy from any and all claims arising out of the complaints filed with the New Jersey DCR.  (Stern Cert. Ex. L.)

## II.  DISCUSSION

### A.    Standard of Review for Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When

the moving party does not bear the burden of proof at trial, the moving party may discharge its

burden by showing that there is an absence of evidence to support the non-moving party's case.

Id. at 325.  If the moving party can make such a showing, then the burden shifts to the

non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary.

Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a

genuine issue of material fact, not just create "some metaphysical doubt as to the material facts."

 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

        In deciding whether an issue of material fact exists, the Court must consider all facts and

their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to

weigh the evidence and determine the truth of the matter, but, rather, to determine whether there

is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there

are no issues that require a trial, then judgment as a matter of law is appropriate.

## B.    New Jersey Law Against Discrimination

        J.A. alleges that the Defendants discriminated against C.A. in violation of the prohibition

in the NJLAD against discrimination in access to public accommodation.  "Gender

discrimination is contrary to the legislative policy of the State of New Jersey," and "[t]he

eradication of the 'cancer of discrimination' has long been one of [the] State's highest

priorities." Frank v. Ivy Club, 120 N.J. 73, 110 (1990) (quoting Dixon v. Rutgers, The State

University of N.J., 110 N.J. 432, 451 (1988) (internal quotation marks omitted)).  The section of

the NJLAD regarding discrimination in access to places of public accommodation states:

> All persons shall have the opportunity to obtain employment, and to
> obtain all the accommodations, advantages, facilities, and privileges

13

> of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex , gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J. Stat. Ann. 10:5-4.  Places of "public accommodation" are broadly defined in the NJLAD and include gymnasiums and elementary and secondary schools, and "any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey."  N.J. Stat. Ann. 10:5-5(l).  Further, the NJLAD also provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof . . . on account of the . . . sex . . . of such person.

N.J. Stat. Ann. 10:5-12(f)(1).

### i.      *Places of "Public Accommodation"*

To determine whether private entities, from commercial to membership organizations, qualify as public accommodations, the focus "appropriately rests on whether the entity 'engages in broad public solicitation, whether it maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations.'"  Thomas v. County of Camden, 386 N.J. Super. 582, 590 (App. Div. 2006) (quoting Ellison v. Creative Learning Ctr., 383 N.J. Super. 581, 588 – 89 (App. Div. 2006)).  The Biddy basketball league is without question a public accommodation, as it is open to children in the community at large and is similar to other previously recognized public

14

accommodations.  See Nat'l Org. for Women, Essex County Chapter v. Little League Baseball,
Inc., 127 N.J. Super. 522, 531 (App. Div.), aff'd 67 N.J. 320 (1974).  The Board of Education is
also unquestionably a public accommodation.  "Public schools and public education as places of
public accommodation assuredly are covered by the anti-discrimination law."  Thomas, 386 N.J.
Super. at 592 (quoting Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 523 (1978) (internal
quotation marks omitted)).  Indeed, the Defendants do not argue that they and Biddy do not
qualify as public accommodations.

   ii.     *J.A.'s Claim of "Indirect" Discrimination Under the NJLAD*

       The NJLAD makes it unlawful for the owner "of any place of public accommodation
<u>directly or indirectly</u> to refuse, withhold from or deny to any person any of the accommodations,
advantages, facilities or privileges thereof" on account of the sex of that person.  N.J. Stat. Ann.
10:5-12(f)(1) (emphasis added).  J.A. claims that the Defendants "indirectly" discriminated
against C.A.  He contends that "Defendants can be liable for their own discriminatory conduct
because, as an 'owner' of a 'public accommodation,' they 'indirectly' discriminated against C.A.
on account of her gender, by allowing Biddy to discriminate against her in Board owned gyms."
(Pl.'s Mot. Partial Summ. J. at 8.)  J.A. argues that, "[a]s a public school facility, Defendants did
not have the choice to allow the discrimination against C.A. to continue in their gyms."  The
Plaintiff cites to N.J. Stat. Ann. 10:5-12(f), but a close reading of the language of the statute
reveals that the Defendants cannot be liable under that portion of the NJLAD.  Section 10:5-12(f)
makes it unlawful for an owner of a place of public accommodation "directly or indirectly to
refuse, withhold from or deny to any person" that accommodation on account of the sex of that
person.  The Board of Education and Dr. Porter, however, did not "refuse, withhold from or

deny" anything to C.A.  It is undisputed that it was Biddy, and not the Board of Education or Dr.

Porter, who refused to let C.A. play on the boys' team.  Indeed, the evidence submitted by the

parties shows that if the decision had been up to Dr. Porter, he would have allowed C.A. to play

on the boys' team.  It is also undisputed that the Defendants did not control Biddy or its

basketball program.  Rather, Biddy advertises the basketball league, accepts enrollment, collects

payment and organizes the program.  The Board of Education "controls" Biddy only in so far as

it controls whether Biddy may use its gymnasiums.  Thus, the Defendants cannot be liable for

discrimination under N.J. Stat. Ann. 10:5-12(f)(1) because it was Biddy, and not the Defendants,

who refused to let C.A. play on the boys' team.[3]  The Defendants were involved in the issue with

C.A. (in addition to attempting to encourage a solution) only in that they allowed Biddy to

continue to use the Board of Education's gymnasiums for the basketball program.

 J.A.'s claim under the NJLAD against the Board of Education and Dr. Porter, therefore, is more

properly analyzed under N.J. Stat. Ann. 10:5-12(e), which prohibits aiding and abetting unlawful

discrimination.

---

[3] Additionally, although J.A. argues in his motion for summary judgment both that the
Defendants are "indirectly" liable under N.J. Stat. Ann. 10:5-12(f)(1), and that they are liable for
aiding and abetting under N.J. Stat. Ann. 10:5-12(e), the Fourth Count of the complaint,
captioned "Violation of NJLAD § 10:5-1 et seq.," seems to allege only aiding and abetting under
the NJLAD.  (Compl. ¶¶ 97 – 103.)

### iii.     J.A.'s Claim of Aiding and Abetting Under the NJLAD

J.A. also alleges that the Board of Education and Dr. Porter aided and abetted Biddy in

discriminating against C.A.  Under the NJLAD, it is unlawful for any person "to aid, abet, incite,

compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."

N.J. Stat. Ann. 10:5-12(e).  "Person" is defined broadly to include "one or more individuals,

partnerships, associations, organizations, labor organizations, corporations, legal representatives,

trustees, trustees in bankruptcy, receivers, and fiduciaries."  N.J. Stat. Ann. 10:5-5(a).

The words "aid" and "abet" are not defined in the NJLAD, but the Supreme Court of

New Jersey discussed their meaning at length in Tarr v. Ciasulli, 181 N.J. 70, 928-29 (2004).

First, the Court looked to the "'ordinary and well understood meaning' of the words," id.

(quoting Safeway Trails, Inc. v. Furman, 41 N.J. 467, 478 (1963)), and noted that words in a

series must be construed consistently with the words around them, id. (citing Gilhooley v.

County of Union, 164 N.J. 533, 542 (2000)).  The words "aid" and "abet" are included with the

series of words "incite," "compel," and "coerce."  The Court provided the following common

dictionary definitions of these words from Webster's II New College Dictionary (rev. updated

ed. 2001):  (1) aid – "to give help or assistance to;" (2) abet – "[t]o incite, encourage, or assist,

esp. in wrongdoing;" (3) incite – "[t]o provoke to action;" (4) compel – "to force, drive, or

constrain;" and (5) coerce – "[t]o force to act or think in a given way by pressure, threats, or

intimidation."  Tarr, 181 N.J. at 928.  The Court held that all of these words used are similar in

meaning and "require active and purposeful conduct."  Id. at 928-29.  The Court then proceeded

to adopt the standard of § 876(b) of the Restatement (Second) of Torts (1979) to define "aid" and

"abet" under the NJLAD.  Section 876(b) states that concert liability is imposed "on an

individual if he or she 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" <u>Tarr</u>, 181 N.J. at 929 (quoting Restatement (Second) of Torts (1979) § 876(b)).  Thus,

> [I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

<u>Id.</u> (citing <u>Hurley v. Atl. City Police Dep't</u>, 174 F.3d 95, 127 (3d Cir. 1999) (internal quotation marks omitted)).

There are five factors to consider in determining whether a defendant provides "substantial assistance" to a principal violator:  (1) the nature of the act encouraged, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the alleged discrimination, (4) the defendant's relations to the others, and (5) the state of mind of the defendant.  <u>Id.</u> (citing Restatement (Second) of Torts § 876(b) cmt. d; <u>Hurley</u>, 174 F.3d at 127 n.27).  Inaction may form the basis for aiding and abetting liability, but only "if it rises to the level of providing substantial assistance or encouragement." <u>Failla v. City of Passaic</u>, 146 F.3d 149, 158 n.11 (3d Cir. 1998) (citing <u>Dici v. Pennsylvania</u>, 91 F.3d 542, 553 (3d Cir. 1996)).  For example, in <u>Hurley</u> the Court of Appeals held that the plaintiff's supervisor could be liable for aiding and abetting sexual harassment where he not only failed to investigate her claims but also engaged in conduct that promoted and encouraged discrimination.  174 F.3d at 127 – 28.  The supervisor controlled the plaintiff's "access to the most effective potential solutions to the harassment," but instead of assisting her, "he told her that she should stop complaining or it

18

would only get worse; he suggested that sleeping with him might protect her; he laughed at the drawings and graffiti about her; and he demeaned her as an officer on a daily basis." Id. at 127. And when she finally requested a transfer because of the harassment, the supervisor gave his superior a memo accusing the plaintiff of lying. Id.

Here, even assuming for the purpose of these motions that Biddy discriminated against C.A.,[4] J.A.'s claim that the Defendants aided and abetted Biddy's discrimination fails because the undisputed facts demonstrate that the Defendants did not provide "substantial assistance" to Biddy.[5]  First, the Defendants did not encourage Biddy not to allow C.A. to play on the boys' team but, instead, Dr. Porter and other members of the Board of Education worked with C.A.'s

---

[4] The Defendants argue that J.A. is "procedurally barred from presenting [his] allegations that Biddy discriminated and that the Board Defendants aided and abetted in that discrimination because 1) the plaintiffs released Biddy from liability for these claims; 2) Biddy is not a party and cannot submit proofs in its defense; and 3) the opinion that Biddy discriminated is not an undisputed fact in this litigation."  (Defs.' Reply Letter Br. at 2.)  While the Defendants are correct that Biddy may not be held liable for discrimination in this action, both because it is not a party to this case and because J.A. released it from liability for such a claim, nothing prevents the court from finding that, based on the undisputed facts, Biddy discriminated against C.A. in violation of the NJLAD and that the Defendants aided and abetted in that discrimination.  J.A. did not release the Defendants from liability for these claims, and the fact that Biddy has been released from these claims does not prevent a court or jury from making a finding of fact that Biddy discriminated; it protects Biddy only from liability to C.A. and her parents for the alleged discrimination.  J.A.'s claim under the NJLAD, however, can be resolved without reaching the issue of whether Biddy discriminated against C.A., so the court will not make a finding as to that question.
[5] The Plaintiff argues that the New Jersey DCR's finding of probable cause "is glaringly significant as it is evidential of the blatant and obvious gender discrimination in which Defendants were engaging."  (Pl.'s Reply Letter Br. at 2.)  The finding of probable cause, however, is just that – a probable finding, not definite.  A finding of probable cause is issued when the Director determines that "there is a reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious person in the belief that the [NJLAD] . . . has been violated."  N.J. Admin. Code 3:4-10.2.  A finding of probable cause does not equate to a finding by a court that unlawful discrimination has occurred, and such a finding does not relieve this court of its duty to make an independent determination based on the undisputed facts presented in this matter.

parents and representatives from Biddy to encourage a settlement of the dispute.  The Defendants

also warned Biddy against engaging in any sort of unlawful discrimination.  Dr. Cappello, the

Secretary of the Board of Education sent a letter to Mr. Cronin at the Village Parks &

Recreation, copied to Mr. Cosgrove at Biddy, expressing that the "Board of Education is

concerned that Biddy Basketball's response to [C.A.'s] request [to play on the boys' team] may

violate state and federal anti-discrimination laws" and that Biddy must immediately demonstrate

its compliance with these laws or it will lose its permission to use the gymnasiums.  (Stern Cert.

Ex. R.)  Later, Dr. Cappello sent a second letter demanding that C.A. be allowed to play on the

boys' team immediately.  These actions by the Defendants do not constitute encouragement.

Rather, they evidence an effort on the part of the Defendants to prevent unlawful discrimination

and resolve the matter so that the basketball program could continue to serve all of the children

involved, including C.A.  The Plaintiff acknowledges these letters but argues that there is no

"evidence of any meaningful action taken by the Defendants to stop the discrimination."  (Plt.'s

Mot. Summ. J. at 15.)  While the court views these letters, and the Defendants' other actions, as

"meaningful actions" to address the situation between Biddy and C.A., the Plaintiff is attempting

to impose a different standard for aiding and abetting when it demands "meaningful action" to

stop the discrimination.  In order to avoid liability for aiding and abetting discrimination under

the NJLAD, the Defendants were obliged only to avoid providing "substantial assistance" to

Biddy in its alleged discrimination.  Although they were not obliged take "meaningful action" to

stop the discrimination, the Defendants still worked with Biddy and C.A.'s family in an attempt

to resolve the situation and end any discrimination against C.A.

Second, regarding "the amount of assistance given," the Plaintiff argues that the Defendants provided a substantial amount of assistance because "Biddy was only able to continue discriminating because the Defendants allowed biddy to continue using their gyms." (Pl.'s Mot. Partial Summ. J. at 15-16.)  While it is true that the Defendants allowed Biddy to continue to use the Board of Education's gyms, they did not do so without trying to foster a resolution to the dispute between Biddy and C.A.'s family.  Again, the Defendants educated themselves about the situation by researching the relevant laws on discrimination, contacting various civil rights offices, researching national standards for similar recreational basketball leagues, and meeting with representatives from Biddy.  The Defendants also sent two letters (copied to Biddy), the first one warning against discrimination in programs carried out in facilities owned by the Board of Education, and the second one demanding that C.A. be allowed to play on the boys' team.  The Defendants did stop short of prohibiting Biddy from using its facilities, and thereby shutting down the entire program.  During that time, however, the Defendants worked to encourage a resolution and by the end of January 2005, the Defendants were led to believe that Biddy and C.A.'s family had reached a settlement.

Lastly, the Defendants were not present for the alleged discrimination, and the Defendants' relation to the others and the state of mind of the Defendants also does not weigh in favor of a finding of substantial assistance.  The Defendants' relationship to Biddy was not that of a supervisor who controlled Biddy.  Rather, the Defendants merely leased the Board of Education's gymnasiums to Biddy.  And, with respect to the state of mind of the Defendants, it is clear from the evidence submitted by the parties that they were concerned about the issue between C.A. and Biddy and about the possibility of discrimination.  They educated themselves

21

regarding the issue by conducting research and contacting several civil rights offices, took steps to encourage a resolution of the problem, and warned Biddy that it would not be able to continue to use the Board of Education's gymnasiums if it were discriminating in violation of the law. These actions evidence a desire on the part of the Defendants to stop or prevent any discrimination, and certainly not an intent to encourage it.

Accordingly, because the Defendants did not provide "substantial assistance" to Biddy in its alleged discrimination against C.A., J.A.'s claim that the Defendants aided and abetted Biddy in violation of the NJLAD fails as a matter of law and will be dismissed.

### III.  CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment dismissing the Fourth Count of the complaint is granted and the Plaintiff's motion is denied.  The court will enter an order implementing this opinion.


_____s/ Dickinson R. Debevoise_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: May 13, 2009